UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LATIFA JAFFER, AHMED M. HIRJI,
SHEHZAD HIRJI, HUSSEIN JAFFER,

                                          Plaintiffs,

         v.

NAUSHAD M. HIRJI, SABIRA HIRJI,

                                          Defendants.

No. 14-CV-2127 (KMK)

OPINION & ORDER

Appearances:

Costantino Fragale, Esq.
Law Office of Costantino Fragale
Eastchester, NY
*Counsel for Plaintiffs*

Andrew D. Brodnick, Esq.
Mount Kisco, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiffs Latifa Jaffer ("Latifa"), Ahmed M. Hirji ("Ahmed"), Shehzad Hirji

("Shehzad"), and Hussein Jaffer ("Hussein") brought this Action against Defendants Naushad M.

Hirji ("Naushad") and Sabira Hirji ("Sabira"), seeking a judgment creating a constructive trust

for their benefit (and the benefit of their siblings) with respect to the property located at 662

Secor Road, Hartsdale, New York (the "Property"), and seeking a declaration that they are the

fee owners of the Property by virtue of adverse possession.  Defendants counterclaimed, seeking

a judgment directing that possession of the Property be delivered to Defendants and granting

Defendants the use and occupancy of the Property.  The Parties have cross-moved for summary

judgment on Plaintiffs' remaining claim for a constructive trust.  For the reasons to follow,

Plaintiffs' Motion is denied and Defendants' Motion is granted.

## I.  Background

### A.  Factual Background

The following facts are taken from the Parties' respective Rule 56.1 Statements of

Undisputed Material Facts and the documents submitted by the Parties in support of their

Motions.

#### 1.  The Hirji Family

Mohamed Hussein Hirji ("Mr. Hirji") and Zehra Hirji ("Zehra") were a married couple

who lived in Tanazania and had seven children, in order of oldest to youngest: Latifa, Farida,

Naushad, Shamim, Effat, Mustafa, and Ahmed.  (*See* Aff'n of Costantino Fragale ("Fragale

Aff'n") Ex. I ("Ahmed Tr."), at 7–8 (Dkt. No. 65); Fragale Aff'n Ex. N ("Hussein Aff.") ¶ 2; *see

also* Pls.' Rule 56.1 Statement of Undisputed Material Facts ("Pls.' 56.1") ¶ 1 (Dkt. No. 67);

Defs.' Rule 56.1 Resp. ("Defs.' 56.1 Resp.") ¶ 1 (Dkt. No. 89); Defs.' Rule 56.1 Statement

("Defs.' 56.1") ¶¶ 1–3 (Dkt. No. 77); Pls.' Answer to Defs.' Rule 56.1 Statement of Undisputed

Material Facts ("Pls.' 56.1 Resp.") ¶¶ 1–3 (Dkt. No. 86).)[1]  At the time of suit, Latifa and her

---

[1] Defendants' Rule 56.1 Response is, to put it mildly, a mess.  Local Rule 56.1 states that "[t]he papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party."  S.D.N.Y. Local Civ. R. 56.1(b).  Despite this clear directive, Defendants have instead set forth, in a single paragraph, all of the paragraphs in Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts to which they do not object, and they have not numbered their paragraphs to correspond to the paragraphs in Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts.  Moreover, Local Rule 56.1 states also that "[e]ach statement by the movant *or opponent* pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  *Id.* at 56.1(d) (emphasis added).  At several points, Defendants have denied a statement that is supported by the record without providing any evidentiary support for that denial.  (*See, e.g.*, Defs.' 56.1 Resp. ¶¶ 3, 5, 6, 8, 9, 10, 11, 12, 13.)

husband Hussein resided at the Property, along with Ahmed and his son, Shehzad, all Plaintiffs in this suit.  (*See* Hussein Aff. ¶ 3; *see also* Pls.' 56.1 ¶ 2; Defs.' 56.1 Resp. ¶ 1.)  Defendant Naushad is married to Defendant Sabira and resides with her in Tanzania.  (*See* Hussein Aff. ¶ 4; *see also* Pls.' 56.1 ¶ 3; Defs.' 56.1 Resp. ¶ 1.)  Naushad's oldest daughter, Naushina Esmail ("Naushina"), holds a power of attorney over Naushad and resides in the state of Washington. (*See* Fragale Aff'n Ex. L ("Naushina Tr."), at 109; *see also* Pls.' 56.1 ¶ 4; Defs.' 56.1 Resp. ¶ 1.) Farida and Shamim are both deceased, Effat resides in Tanzania, and Mustafa resides in New York.  (*See* Hussein Aff. ¶ 5; *see also* Pls.' 56.1 ¶ 5; Defs.' 56.1 Resp. ¶ 1.)

### 2. The Property and the Transfers

This intra-family dispute has its origins in the purchase of the Property in 1982.  In July 1982, the Property was purchased by Mr. Hirji and deeded to two of his sons, Ahmed and Mustafa.  (*See* Fragale Aff'n Ex. C; *see also* Pls.' 56.1 ¶ 7; Defs.' 56.1 Resp. ¶ 1.)  The Parties dispute whether Mr. Hirji himself paid for the entire value of the property, or whether a portion of the property value was paid for by Naushad.  (*See* Fragale Aff'n Ex. M ("Naushad Tr."), at 17; *see also* Pls.' 56.1 ¶ 8.)  Although the Parties additionally dispute why the Property was deeded to Ahmed and Mustafa, Latifa, Ahmed, and Gould, the attorney who represented Mr. Hirji in all of the deeds executed with respect to the Property, each testified that they believed the Property was intended to be used as a family home and that Ahmed and Mustafa merely held the Property for the benefit of the entire family, in accordance with Mr. Hirji's wishes.  (*See* Fragale Aff'n Ex. H ("Gould Tr."), at 10 ("I believe [Mr. Hirji] wanted to purchase a home for his family to live in here."); Ahmed Tr. 14 ("Q: Did your father explain why he wanted the house held in your

---

Accordingly, where Defendants have offered no citation to admissible evidence in the record, the Court will consider that fact undisputed.  Of additional note, Defendants have not cited to a single document in their own Rule 56.1 Statement.  (*See generally* Defs.' 56.1.)

name and Mustafa's name?  A: Because he said, [i]t's the family house.  It's going to stay as a family house."); Fragale Aff'n Ex. K ("Latifa Tr."), at 6 ("All I know, that [Mr. Hirji] told me—he advised me that I am buying this—purchasing this home for the family.").)  There is no dispute, however, that Mustafa and Ahmed were nominal title holders of the Property on behalf of their father, Mr. Hirji.  (*See* Defs.' 56.1 ¶ 5; Pls.' 56.1 Resp. ¶ 5.)

In December 1982, Ahmed and Mustafa deeded the Property to themselves and their mother, Zehra, as joint tenants.  (*See* Fragale Aff'n Ex. E; *see also* Pls.' 56.1 ¶ 12; Defs.' 56.1 Resp. ¶ 1; Defs.' 56.1 ¶ 7; Pls.' 56.1 Resp. ¶ 7.)  Zehra paid no consideration for the deed.  (*See* Pls.' 56.1 ¶ 13; Defs.' 56.1 Resp. ¶ 1; Defs.' 56.1 ¶ 8; Pls.' 56.1 Resp. ¶ 8.)  In 1984, Zehra died intestate in New York, (*see* Hussein Aff. ¶ 6; *see also* Pls.' 56.1 ¶ 14; Defs.' 56.1 Resp. ¶ 1; Defs.' 56.1 ¶ 9; Pls.' 56.1 Resp. ¶ 9), and her interest in the Property thus devolved to Ahmed and Mustafa.

On December 5, 1989, Mustafa and Ahmed deeded the Property to Mr. Hirji and Naushad for no consideration.  (*See* Fragale Aff'n Ex. F; *see also* Pls.' 56.1 ¶ 15; Defs.' 56.1 Resp. ¶ 1; Defs.' 56.1 ¶¶ 10–11; Pls.' 56.1 Resp. ¶¶ 10–11.)  While preparing the new deed in 1989 (the "Third Deed"), Mr. Gould had no contact with Naushad.  (*See* Gould Tr. 33; Naushad Tr. 74; *see also* Pls.' 56.1 ¶ 16; Defs.' 56.1 Resp. ¶ 1.)  According to Ahmed, the Third Deed was executed because Mr. Hirji was thinking about getting married and "wanted his house back," and Naushad was included on the deed because Mr. Hirji feared that if he passed away while the Property was in his name only, the state would take the house.  (Ahmed Tr. 22–23.)  According to Hussein, it was his idea to add Naushad based on his understanding of what could happen if Mr. Hirji passed away while the Property was in his name only.  (*See* Fragale Aff'n Ex. J ("Hussein Tr."), at 29–31.)

In 1998, Mr. Hirji died intestate in Tanzania.  (*See* Naushad Tr. 23; *see also* Pls.' 56.1 ¶ 24; Defs.' 56.1 Resp. ¶ 1; Defs.' 56.1 ¶ 12; Pls.' 56.1 Resp. ¶ 12.)  In February 2001, Naushad deeded the Property to himself and his wife, Sabira.  (*See* Fragale Aff'n Ex. G; Hussein Tr. 51; *see also* Pls.' 56.1 ¶ 25; Defs.' 56.1 Resp. ¶ 1; Defs.' 56.1 ¶ 13; Pls.' 56.1 Resp. ¶ 13.)  Hussein was responsible for making the arrangements in connection with the 2001 deed.  (*See* Hussein Tr. 51; *see also* Pls.' 56.1 ¶ 26; Defs.' 56.1 Resp. ¶ 1.)

### 3.  Occupation and Upkeep of the Property

Between 1984 and 2014, all Plaintiffs, with the exception of Shehzad, have resided at the Property.  (*See* Ahmed Tr. 11; *see also* Pls.' 56.1 ¶ 36; Defs.' 56.1 Resp. ¶ 1; Defs.' 56.1 ¶ 19; Pls.' 56.1 Resp. ¶ 19.)  During that period, Plaintiffs never paid rent.  (*See* Ahmed Tr. 63; Hussein Tr. 49, 95–96, 105, 107; Latifa Tr. 15; *see also* Pls.' 56.1 ¶ 37; Defs.' 56.1 Resp. ¶ 13.)[2] Between 1984 and 2013, Plaintiffs paid all subject property taxes and have maintained the subject property.  (*See* Ahmed Tr. 76; Hussein Tr. 107; *see also* Pls.' 56.1 ¶ 40.)[3]  During that time, Plaintiffs made permanent repairs and capital improvements to the Property, including replacing the wood paneling for the house, putting in recessed lighting, extending the driveway, replacing the fence, adding a bathroom, and adding a kitchen.  (*See* Hussein Tr. 62–63; *see also* Pls.' 56.1 ¶ 41; Defs.' 56.1 Resp. ¶ 1.)

Up until 2013, Naushad had visited the Property only once, for the wedding of Hussein's and Latifa's daughter.  (*See* Naushad Tr. 28–29; *see also* Pls.' 56.1 ¶ 42; Defs.' 56.1 Resp. ¶ 1.)  Naushad never hired anyone to inspect the Property, and up until 2014, Naushad never paid any

---

[2] Defendants state that they "do not admit this statement" but "have conceded this fact for purposes of this summary judgment motion."  (Defs.' 56.1 Resp. ¶ 13.)

[3] Defendants did not respond to ¶ 40 of Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts.

taxes on the Property.  (*See* Naushad Tr. 24–25; *see also* Pls.' 56.1 ¶¶ 43–44; Defs.' 56.1 Resp. ¶ 1.)

### 4.  2013 Visit and Notice of Termination

In November 2013, Naushina and her husband visited Ahmed and Hussein at the Property and secretly recorded a conversation between them.  (*See* Naushina Tr. 88–91; *see also* Pls.' 56.1 ¶ 27; Defs.' 56.1 Resp. ¶ 1.)  Prior to her deposition in this case, Naushina had not disclosed the recording to Plaintiffs or her attorney.  (*See* Naushina Tr. 89–90; *see also* Pls.' 56.1 ¶ 28; Defs.' 56.1 Resp. ¶ 1.)  During the conversation, Hussein reaffirmed his belief that the Property was a family home.  (*See* Naushina Tr. 97; *see also* Pls.' 56.1 ¶ 29; Defs.' 56.1 Resp. ¶ 1.)  He insisted, several times, that the Property could not be sold without the consent of Zehra, and that because she had passed away, her shares had devolved to her children.  (*See* Fragale Aff'n Ex. S.)  Naushina's husband told Hussein that Naushad had not been sure whether he owned that Property, and told Hussein that it was only through conducting a title search that he learned that the Property was owned by Naushad and Sabira.  (*See id.*; *see also* Pls.' 56.1 ¶ 32.)  Although Naushina indicated that the conversation lasted between three and four hours, Plaintiffs have received only portions of the recorded conversation.  (*See* Pls.' 56.1 ¶ 33.)[4]  Naushina also recorded a conversation between her parents and their cousins that took place in Tanzania regarding the Property, (*see* Naushina Tr. 91–93; *see also* Pls.' 56.1 ¶ 34; Defs.' 56.1 Resp. ¶ 12), although no portion of that recording has been produced in this litigation.

On January 22, 2014, Naushad, acting through Naushina (who at that time possessed power of attorney over Naushad), issued a Notice of Termination to Plaintiffs requiring them to

---

[4] Defendants did not respond to ¶ 33 of Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts.

vacate the Property on or before February 28, 2014.  (*See* Fragale Aff'n Ex. T; *see also* Pls.' 56.1 ¶ 35; Defs.' 56.1 Resp. ¶ 1.)  The Notice of Termination informed Plaintiffs that if they failed to vacate the Property, a summary proceeding would be commenced against them to have them evicted and removed from the Property.  (*See* Fragale Aff'n Ex. T; *see also* Pls.' 56.1 ¶ 35; Defs.' 56.1 Resp. ¶ 1.)

### 5.  Other Homes & Gifts

In addition to the Property, Mr. Hirji has provided for his family in other ways.  At some point in time, he gave $80,000 to Naushad.  (*See* Naushad Tr. 82; *see also* Pls.' 56.1 ¶ 22; Defs.' 56.1 Resp. ¶ 1.)  Mr. Hirji also gave Mustafa and Ahmed each $75,000 to purchase homes in Ossining, New York.  (*See* Ahmed Tr. 25–26; Hussein Tr. 103–04; *see also* Pls.' 56.1 ¶ 22; Defs.' 56.1 Resp. ¶ 1; *see also* Defs.' 56.1 ¶ 14; Pls.' 56.1 Resp. ¶ 14.)  Hussein is the nominee owner for both of the homes in Ossining.  (*See* Ahmed Tr. 34–35; Hussein Tr. 103–04; *see also* Defs.' 56.1 ¶ 15; Pls.' 56.1 Resp. ¶ 15.)

### B.  Procedural History

Plaintiffs filed their initial Complaint on February 25, 2014, in the Supreme Court of the State of New York, County of Westchester.  (*See* Dkt. No. 1.)  Defendants timely removed the Action to this Court on the basis of diversity jurisdiction.  (*See id.*)  Defendants filed their Answer on March 31, 2014, asserting two counterclaims.  (*See* Dkt. No. 3.)  After Plaintiffs obtained new counsel to handle the case in federal court, (*see* Dkt. Nos. 6, 7), the Court held a conference wherein Plaintiffs indicated they wished to file an Amended Complaint, (*see* Dkt. (minute entry for Sept. 16, 2014)).  Plaintiffs filed their Amended Complaint on September 29, 2014, (*see* Dkt. No. 12), and Defendants filed their Answer on October 17, 2014, setting forth the same counterclaims, (*see* Dkt. No. 13).  Shortly thereafter, Defendants sought and were given

leave to file a Motion for Judgment on the Pleadings.  (*See* Dkt. No. 14; *see also* Dkt. (minute entry for Oct. 22, 2014).)  Defendants filed their Motion on November 14, 2014, (*see* Dkt. No. 17), and Plaintiffs filed their Answer to Defendants' counterclaims on December 11, 2014, (*see* Dkt. No. 20).

On October 27, 2015, the Court issued an Opinion & Order granting in part and denying in part Defendants' Motion.  (*See* Dkt. No. 24.)  Specifically, the Court held that, on the facts alleged, Plaintiffs' claim for a constructive trust was not time-barred.  (*See id.* at 13.)  However, the Court held that Plaintiffs had not stated a claim for adverse possession.  (*See id.* at 19.)  Accordingly, that claim was dismissed.  (*See id.*)

The Court thereafter entered a discovery schedule.  (*See* Dkt. No. 26.)  On June 14, 2016, the Court held a conference wherein the Parties sought leave to file cross-motions for summary judgment.  (*See* Dkt. (minute entry for June 14, 2016).)  Leave was granted, and the Court entered a scheduling order.  (*See* Dkt. No. 55.)  On August 19, 2016, Plaintiffs filed their Motion for Summary Judgment and accompanying papers.  (*See* Dkt. Nos. 64–67.)  Defendants filed their Motion for Summary Judgment and accompanying papers on August 30, 2016.  (*See* Dkt. Nos. 75–79.)  After responses and replies were filed, the Motion was fully submitted on October 4, 2016.

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must

"construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

9

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted).  At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted).  Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . .");  *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (internal quotation marks omitted)).

B.  Analysis

    1.  Evidentiary Issues

There are three evidentiary issues that must be resolved before proceeding to the merits, as the Court is permitted to consider, at this stage, only evidence that would be admissible at trial.  *See Nora Beverages*, 164 F.3d at 746.

    a.  Adverse Inference for November 2013 Conversation

Plaintiffs first argue that they are entitled to an adverse inference with respect to the portions of the recording Naushina made of her conversation with Plaintiffs in November 2013 that were deleted when Naushina transferred the audio file from her cell phone to her computer. (*See* Mem. of Law in Supp. of Pls.' Mot. for Summ. J. & Sanctions Against Defs. ("Pls.' Mem.") 21–23 (Dkt. No. 66).)

The Second Circuit has held that

> [a] party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012) (internal quotation marks omitted).  In determining whether records were destroyed "with a culpable state of mind," the Second Circuit has instructed that this element may be "satisfied by a showing that the evidence was destroyed 'knowingly, even if without intent to breach a duty to preserve it, or negligently.'" *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir. 2002) (alteration and italics omitted) (quoting *Byrnie v. Town of Cromwell*, 243 F.3d 93, 109 (2d Cir. 2001)).

This standard, however, was partially supplanted by the 2015 amendments to the Federal Rules of Civil Procedure, which now provide that "[i]f electronically stored information that

should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it," a court may, "upon finding prejudice to another party," "order measures no greater than necessary to cure the prejudice," or may impose certain adverse inferences or sanctions "upon finding that the party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e). While the Second Circuit has not yet published an opinion examining the impact of the new Rule 37(e), courts in the Second Circuit have recognized that Rule 37(e) replaces the prior framework for spoliation claims when electronically stored information is at issue. *See Citibank, N.A. v. Super Sayin' Publ'g, LLC*, No. 14-CV-5841, 2017 WL 462601, at *2 (S.D.N.Y. Jan. 17, 2017) ("[D]istrict courts in [the Second Circuit] ha[ve] already acknowledged that the December 1, 2015 amendment to Rule 37 has been interpreted as overruling the holding in *Residential Funding Corp.*" (internal quotation marks omitted)); *In re Bridge Constr. Servs. of Fla., Inc.*, 185 F. Supp. 3d 459, 472–73 (S.D.N.Y. 2016) ("The recent Amendments to Rule 37(e) of the Federal Rules of Civil Procedure have changed the rules relating to spoliation when it involves Electronically Stored Information ("ESI"). In particular, it overruled *Residential Funding* because no adverse inference instruction is available unless the proponent of the request for the instruction demonstrates that the party who destroyed the ESI acted with the intent to deprive another party of the information's use in the litigation."). Accordingly, litigants seeking an adverse inference for the destruction of electronically stored information face a tougher climb than in years past.

As an initial matter, Plaintiffs have not provided any evidence, or even argued, that Naushina destroyed the evidence in question "with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2); *see also Citibank*, 2017 WL 462601, at *2 (denying spoliation motion under Rule 37(e)(2) because the movant failed to show

that non-movants acted "with intent to deprive" the movant of the use of the information at issue (internal quotation marks omitted)).  There is therefore no basis to impose an adverse inference. Plaintiffs' only recourse is thus under Rule 37(e)(1), which requires a finding of "prejudice to another party from loss of the information," and limits the remedy to "measures no greater than necessary to cure the prejudice."  But here, Plaintiffs have not demonstrated any prejudice.  At her deposition, Naushina did not offer any testimony that Plaintiffs made statements unfavorable to their position during the conversation.  (*See* Naushina Tr. 95–98.)  In fact, according to Naushina, Hussein reaffirmed his position that the Property was a "family house."  (*See id.* at 97.)  Had Hussein wished to clarify or supplement the information on the recording, he could have done so via affidavit, but his affidavit makes no mention of the November 2013 conversation, (*see* Hussein Aff.), thus begging the question of what Plaintiffs contend transpired during the conversation that was lost when Naushina transmitted the audio file to her computer.

Under the revised Rule 37(e), there has been no showing of an intent to deprive Plaintiffs of information to which they are entitled, nor has there been any showing of prejudice.  The Court therefore declines to draw an adverse inference or impose any other sanctions on Defendants for failure to preserve the entire recording of the November 2013 conversation.[5]

### b.  Adverse Inference for Fifth Amendment Privilege

Plaintiffs next argue that because Naushad, invoking his Fifth Amendment rights, declined to answer certain questions about his collection of rent or his payment of income taxes, (*see* Naushad Tr. 57–59), they are entitled to an inference "that Naushad would have had to

---

[5] Though Plaintiffs also mention that "Defendants have never produced the recording that Naushina's sister made of their cousins," (Pls.' Mem. 23), they do not allege that the recording was destroyed, that it was destroyed with any culpable intent, or that they were prejudiced by the destruction.  If Plaintiffs' point is only that they were entitled to the recording but did not receive it during discovery, their remedy was to file a motion to compel under Rule 37(a).

concede that he never collected any rent, or that he knew and violated his income tax requirements under state and federal law," (Pls.' Mem. 25). Defendants state that they are willing to concede for purposes of the Motions that Plaintiffs did not pay rent to either Naushad or Mr. Hirji, and that it is therefore premature to draw any adverse inferences on this point. (*See* Mem. of Law in Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Opp'n") 15–16 (Dkt. No. 88).) Plaintiffs did not press this point in their reply brief.

It is unclear how Naushad's refusal to answer a question as to his understanding of whether he could collect rent without paying income taxes could give rise to an adverse inference that he did not collect rent, particularly in light of his extensive testimony to the contrary. (*See, e.g.*, Naushad Tr. 22–24, 29–32.) But in any event, because there is no dispute, for purposes of the pending Motions, that Plaintiffs did not pay rent while living on the Property, the Court agrees with Defendants that there is no need to examine the implications of Naushad's invocation of the Fifth Amendment at this time.

### c. Dead Man's Statute

The third and final evidentiary issue posed by the Parties is whether certain testimony is excluded by New York's Dead Man's Statute. New York's Dead Man's Statute provides, in relevant part:

> Upon the trial of an action or the hearing upon the merits of a special proceeding, a party or a person interested in the event, or a person from, through or under whom such a party or interested person derives his interest or title by assignment or otherwise, shall not be examined as a witness in his own behalf or interest, or in behalf of the party succeeding to his title or interest against the executor, administrator or survivor of a deceased person or the committee of a mentally ill person, or a person deriving his title or interest from, through or under a deceased person or mentally ill person, by assignment or otherwise, concerning a personal transaction or communication between the witness and the deceased person or mentally ill person, except where the executor, administrator, survivor, committee or person so deriving title or interest is examined in his own behalf, or the testimony

14

of the mentally ill person or deceased person is given in evidence, concerning the
same transaction or communication.

N.Y. C.P.L.R. § 4519.  Put more simply, the Dead Man's Statute "'disqualifies parties interested
in litigation from testifying about personal transactions or communications with deceased . . .
persons' in order 'to protect the estate of the deceased from claims of the living who, through
their own perjury, could make factual assertions which the decedent could not refute in court.'"
*ROI, Inc. v. Hidden Valley Realty Corp.*, 845 N.Y.S.2d 848, 850 (App. Div. 2007) (some internal
quotation marks omitted) (quoting *Poslock v. Teachers' Ret. Bd. of Teachers' Ret. Sys.*, 666
N.E.2d 528, 530 (N.Y. 1996)).  Although New York law is to the contrary, evidence that would
be excluded at trial under the Dead Man's Statute may not be considered on a motion for
summary judgment in federal court.  *See Clark v. Meyer*, 188 F. Supp. 2d 416, 420–21 (S.D.N.Y.
2002) ("[I]rrespective of how New York might decide this question, the federal rule requires
exclusion of evidence on summary judgment motions which the dead man's statute would
exclude at trial." (footnote omitted)); *see also Athineos v. Andromeda Invs. Co.*, No. 13-CV-
5076, 2015 WL 6467842, at *7 (S.D.N.Y. Oct. 23, 2015) (same).

    The Parties' briefing on this issue is, at times, difficult to follow.  In their moving papers,
Defendants argue that none of Plaintiffs can testify as to any statements made by Mr. Hirji
regarding his promises and expectations for the Property because such testimony is barred by
New York's Dead Man's statute, which applies in a diversity action.  (*See* Mem. of Law in Supp.
of Defs.' Mot. for Summ. J. ("Defs.' Mem.") 12 (Dkt. No. 78).)  In their opposition papers,
Plaintiffs respond that Mr. Gould's testimony is not barred by the statute because he has no
interest in the litigation, making the additional argument that the use of the Property, irrespective
of the admissibility of Plaintiffs' testimony, supports their argument for creation of a
constructive trust.  (*See* Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. ("Pls.' Opp'n") 8–10

15

(Dkt. No. 85).)  In Defendants' opposition papers, they argue, without prompting, that the testimony from Ahmed that *they* offer in support of their Motion is not prohibited by the Dead Man's Statute.  (*See* Defs.' Opp'n 11–13.)  In their reply papers, Plaintiffs reiterate their earlier points, but additionally argue that the Dead Man's Statute does not apply because the testimony is not being offered against Mr. Hirji or his estate.  (*See* Reply Mem. of Law in Supp. of Pls.' Mot. for Summ. J. & Sanctions ("Pls.' Reply") 14 (Dkt. No. 90).)  In Defendants' reply papers, they argue that Plaintiffs have conceded that they cannot testify as to statements allegedly made by Mr. Hirji, but do not otherwise discuss the Dead Man's Statute.  (*See* Reply Mem. of Law in Further Supp. of Defs.' Mot. for Summ. J. ("Defs.' Reply") 6 (Dkt. No. 91).)

Whatever is to be made of the Parties' ever-shifting positions with respect to the Dead Man's Statute, the statute has no application in this context.  The Dead Man's Statute prohibits interested parties from testifying "against" a decedent's estate.  *See* N.Y. C.P.L.R. § 4519.  Thus, where the interests of a decedent's estate are not directly at stake, the statute does not apply.  *See In re Zalk*, 892 N.E.2d 369, 374 (N.Y. 2008) (holding that an attorney facing disciplinary charges was not prohibited from testifying as to his deceased client's instructions, notwithstanding that the client's estate could potentially receive some compensation in the form of restitution as a result of the charges, reasoning that "although [the client] testified as a witness in his own behalf or interest, he did *not* testify against the executor, administrator or survivor of [the client]," "he testified against the Disciplinary Committee, which is none of these latter" (alteration and internal quotation marks omitted)); *In re Myers*, 845 N.Y.S.2d 510, 512 (App. Div. 2007) ("[T]he Dead Man's Statute is not applicable herein since, although respondent was the administrator of his mother's estate, the instant proceeding is a trust proceeding and not a dispute concerning the proper disposition of a decedent's estate.").  As joint tenants, when Mr.

Hirji passed away, his interest in the Property automatically devolved to Naushad.  *See Trotta v. Ollivier*, 933 N.Y.S.2d 66, 69 (App. Div. 2011) ("The right of survivorship has been defined as a right of automatic inheritance where, upon the death of one joint tenant, the property does not pass through the rules of intestate succession, but is automatically inherited by the remaining tenant." (internal quotation marks omitted)); *see also Goetz v. Slobey*, 908 N.Y.S.2d 237, 239 (App. Div. 2010) ("A joint tenancy is an estate held by two or more persons jointly, with equal rights to share in its enjoyment during their lives, and creating in each joint tenant a right of survivorship." (internal quotation marks omitted)).  Mr. Hirji (or his estate) no longer has any interest in the Property, and therefore it cannot be said that any testimony with respect to the current disposition of the Property is being offered "against" him or his estate.  There is thus no basis to invoke the Dead Man's Statute in this context.

### 2.  Statute of Limitations

With respect to the merits, Defendants argue that Plaintiffs' claim for a constructive trust is barred by the statute of limitations.  (*See* Defs.' Mem. 21–22.)  As Plaintiffs recognize, this issue was addressed at the motion to dismiss stage, wherein the Court held that because the Amended Complaint did not, on its face, clearly show that Plaintiffs' constructive trust claim was time-barred, Defendants' motion was denied.  (*See* Op. & Order 12–13.)  The question at this stage is therefore whether the facts developed through discovery require a different conclusion.

"A cause of action for a consecutive trust is governed by New York's six-year statute of limitations applicable to those claims 'for which no limitation is specifically prescribed by law.'" *Reale v. Reale*, 485 F. Supp. 2d 247, 252 (W.D.N.Y. 2007) (quoting N.Y. C.P.L.R. § 213(1)). "The statute of limitations for a constructive trust claim 'starts to run upon the occurrence of the

wrongful act giving rise to a duty of restitution.'" *Quiroga v. Fall River Music, Inc.*, No. 93-CV-3914, 1998 WL 851574, at \*34 (S.D.N.Y. Dec. 7, 1998) (quoting *Sitkowski v. Petzing*, 572 N.Y.S.2d 930, 932 (App. Div. 1991)).  In general, "the date of the 'wrongful act' 'is the date that the party holding legal title takes some action that is inconsistent with the promise he made to the transferor.'" *Lia v. Saporito*, 909 F. Supp. 2d 149, 167 (E.D.N.Y. 2012) (quoting *Reale*, 485 F. Supp. 2d at 252)), *aff'd*, 541 F. App'x 71 (2d Cir. 2013).  Thus, where the allegation is that the "constructive trustee wrongfully withh[eld] property acquired lawfully from the beneficiary," then the cause of action accrues "from the date the trustee breaches or repudiates the agreement to transfer the property." *Quiroga*, 1998 WL 851574, at \*34 (internal quotation marks omitted). "The law requires proof of a repudiation by the fiduciary which is [c]lear and made known to the beneficiaries." *In re Barabash Estate*, 286 N.E.2d 268, 270 (N.Y. 1972).

In the prior Opinion & Order, the Court noted that "Plaintiffs do not allege that Defendants acquired the property wrongfully," but rather "Plaintiffs allege that Naushad wrongfully withheld the Property that he acquired lawfully from Ahmed and Mustafa." (Op. & Order 10.)  The statute of limitations thus began running on the date Naushad (or Naushina) repudiated the alleged constructive trust.  The Court concluded that, under the facts alleged, the conveyance of the Property in 2001 from Naushad to Naushad and Sabira did not constitute a "clear breach or repudiation of the agreement between Naushad and Plaintiffs," but left open the possibility that discovery may show otherwise.  (*See id.* at 12.)

Defendants offer a number of arguments for why, at this stage and with the benefit of a complete record, the Court should dismiss Plaintiffs' constructive trust claim on statute of limitations grounds.  First, Defendants argue that the 2001 transfer "constituted a violation of the alleged constructive trust because as a tenant by the entirety, Defendant Sabira Hirji held title to

18

the *whole* of the [Property]"; had Naushad died, title would vest exclusively in Sabira "and title

would no longer be held by *any* of the children of [Mr. Hirji]"; Sabira was entitled to sell,

mortgage, or otherwise encumber her interest; and had Naushad attempted to transfer the

Property back to himself or to Plaintiffs, such a transfer would not have affected the rights of

Sabira. (*See* Defs.' Mem. 21–22.)  But these legal truisms do nothing more than reaffirm

Defendants' belief, already rejected by the Court, that Plaintiffs' claim accrued in 2001 because

the 2001 transfer, by its own terms, was inconsistent with Plaintiffs' claim for a constructive

trust.  These arguments, in fact, state nothing more than the bare legal ramifications of creating a

joint tenancy.  The Court was well aware in its prior Opinion & Order of the effects of creating a

joint tenancy, but nonetheless held that the mere transfer in 2001 of the Property from Naushad

to Naushad and Sabira did not start the statute of limitations running because Plaintiffs had not

alleged "that Sabira exercised her rights to their exclusion prior to 2014, or that there were other

indications of a breach or repudiation of the agreement made in 1989."  (Op. & Order 12.)  It is

always the case in a claim for a constructive trust that the property is held by someone hostile to

the interests of the claimant, but that does not absolve the Court of conducting the factually-

intensive inquiry into when the titleholders exercised their rights in a manner inconsistent with

the rights of the claimant.  It is for this reason that the Court invited the Parties to develop "the

factual landscape concerning the circumstances and understandings of the Parties at the time the

[2001 transfer] was executed."  (*Id.* at 12 n.2.)

Defendants do make two arguments based on the record that require a closer look.  First,

Defendants argue that "not only was the transfer made to Sabira without any promises made by

her, she was also not liked by the rest of the family."  (Defs.' Mem. 22.)  But the fact that Sabira

(allegedly) made no promises with respect to the Property speaks to the merits of Plaintiffs'

claim, not the time at which it accrued—the question is not whether Plaintiffs will ultimately prevail on their constructive trust claim, but rather at what point they were on notice that such a claim would be necessary to preserve their interests in the Property.  Nor does the Court see how Sabira's standing in the family is relevant; Plaintiffs may have been aware that Sabira was more likely to repudiate the alleged constructive trust than Naushad, but that, again, is not the test for determining when Plaintiffs' claim for a constructive trust arose.  Second, Defendants point out that "the transfer was made upon the suggestion of [Hussein] without having ensured that [Sabira] was taking title to the [Property] along with a promise to hold it [in] constructive trust." (*Id.*)  Again, this argument goes to the merits of Plaintiffs' claim, not to the time at which Plaintiffs' claim accrued.

Despite Defendants' conclusory assertions to the contrary, the record belies any claim that Plaintiffs were on notice prior to 2013 or 2014 that Naushad and/or Sabira were repudiating the alleged agreement.  Naushad testified that prior to 2013, "everything was excellent.  The relation [with Plaintiffs] was excellent.  [His] brother, Hussein, was the elder, and [the family] would do nothing without first consulting him.  Everything went smooth until 2013.  That is when things went bad, and everything broke."  (Naushad Tr. 63.)  And the Parties agree, at least for purposes of the pending Motions, that neither Naushad nor Sabira nor Naushina ever received rent from Plaintiffs.  (*See* Defs.' 56.1 Resp. ¶ 13.)  The record, in fact, is largely devoid of any information relating to the period between 1989 and 2013, with the exception of Mr. Hirji's death and the 2001 transfer.  The Court can discern no facts, and Defendants have pointed to none, that could reasonably be said to have constituted a clear breach or repudiation of the alleged constructive trust prior to 2013.  That Defendants have apparently abandoned this

argument in their reply brief is itself evidence of its shaky footing.  (*See generally* Defs.' Reply.)
Accordingly, Plaintiffs' claim for a constructive trust is not time-barred.

       3.  Estoppel

      Defendants next argue that Ahmed is collaterally estopped from arguing for a
constructive trust in this case because in his divorce proceeding in 2012, he represented that he
had no interest in any real property.  (*See* Defs.' Mem. 13–17.)

      The doctrine of collateral estoppel has no application here.  In New York, collateral
estoppel "precludes a party from relitigating in a subsequent action or proceeding an issue raised
in a prior action or proceeding and decided against that party or those in privity." *Buechel v.
Bain*, 766 N.E.2d 914, 919 (N.Y. 2001).[6]  Collateral estoppel applies only when (1) there is "an
identity of issue which has necessarily been decided in the prior action and is decisive of the
present action," and (2) there was "a full and fair opportunity to contest the decision now said to
be controlling." *Id.*  New York courts thus require "identity of issue" when applying collateral
estoppel, but here, there has never been an adjudication of whether any of Plaintiffs is entitled to
a constructive trust of the Property.  Defendants point to no decision, either of the family court
that presided over Ahmed's matrimonial action or any other court, discussing the issues raised
herein, nor is there any indication that the issue of constructive trust was ever raised in the
divorce proceeding.  And Defendants cannot argue that the stipulated settlement in the divorce
proceeding decided the issue—the Separation and Property Settlement Agreement makes no
mention of the Property.  (*See* Decl. of Andrew D. Brodnick ("Brodnick Decl.") Ex. 13 (Dkt. No.
76).)  Moreover, the preliminary conference stipulation does, in fact, list the Property as

---

    [6] Because the question is whether a prior New York court decision has preclusive effect,
the Court must apply the collateral estoppel law of New York.  *See Chartier v. Marlin Mgmt.,
LLC*, 202 F.3d 89, 94 (2d Cir. 2000) (citing 28 U.S.C. § 1738).

Ahmed's "Marital Residence," and the information below this section indicates that the appraisal "[e]valuation [is] to await determination re ownership of the [P]roperty." (*See* Brodnick Decl. Ex. 11.) Thus, to the extent the disposition of the Property was even contemplated, it was never resolved on the record.

The Court infers, however, that Defendants may have intended to raise the defense of *judicial* estoppel, which, in New York, "precludes a party who assumed a certain position in a prior legal proceeding and who secured a judgment in his or her favor from assuming a contrary position in another action simply because his or her interests have changed." *Prudential Home Mortg. Co. v. Neildan Constr. Corp.*, 618 N.Y.S.2d 108, 110 (App. Div. 1994). The doctrine is used "to estop parties from adopting such contrary positions because the judicial system 'cannot tolerate this playing fast and loose with the courts.'" *Kimco of N.Y., Inc. v. Devon*, 558 N.Y.S.2d 630, 632 (App. Div. 1990). But judicial estoppel is inapplicable here because Defendants cannot show that Ahmed obtained a favorable judgment in the divorce proceeding. Courts in New York have routinely held, including in one case where a constructive trust claim was raised, that a party who settles before a court adopts the position taken by that party in a prior litigation is not estopped from arguing a contrary position in a subsequent litigation. *See Wenger v. DMR Realty Mgmt., Inc.*, 934 N.Y.S.2d 221, 222 (App. Div. 2011) (holding, in a case seeking to establish a constructive trust, that the plaintiff was not bound by statements made in an affidavit "submitted in connection with an unrelated action," because "the prior action settled before the Supreme Court considered the position taken by the plaintiff in the . . . affidavit"); *see also In re Estate of Costantino*, 890 N.Y.S.2d 739, 740–41 (App. Div. 2009) (agreeing that because "the matrimonial proceeding ended in a settlement," and "thus does not provide the prior success necessary for judicial estoppel," application of the doctrine was inappropriate); *Chem. Bank v.*

*Aetna Ins. Co.*, 417 N.Y.S.2d 382, 384 (Sup. Ct. 1979) ("A party may not appropriately assert the defense of judicial estoppel unless it is demonstrated that the party against whom the estoppel is sought to be imposed actually procured a judgment in his favor as a result of the inconsistent position taken by him in the prior proceeding. . . .  A settlement by a stipulation, and a discontinuance of an action pursuant thereto, is not construed as an adjudication in favor of any party to the action." (citation omitted)); *accord Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Georgiadis*, 903 F.2d 109, 114 (2d Cir. 1990) ("The doctrine of judicial estoppel . . . applies only if the party against whom the estoppel is claimed actually obtained a judgment as a result of the inconsistent position.  That factor is absent here, since [the prior proceeding] was dismissed voluntarily in accordance with a stipulation." (citation omitted)).  Here, the divorce proceeding was discontinued by settlement, and although the court entered judgment in accordance with the settlement and stipulation, there is no indication, either in the court's findings of fact or in the final judgment, that the court considered, relied on, or even knew about the representations made by Ahmed in his statement of net worth.  (*See* Brodnick Decl. Exs. 14–15.)

Neither collateral estoppel nor judicial estoppel is applicable here, and the Court will not dismiss Ahmed's claim on those grounds.

### 4.  Constructive Trust

The Court turns now to the heart of the Motions—whether Plaintiffs are entitled to a constructive trust.

In New York, "a constructive trust may be imposed when property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest."  *Sharp v. Kosmalski*, 351 N.E.2d 721, 723 (N.Y. 1976) (alteration and internal quotation marks omitted).  Constructive trust is "the formula through which the

conscience of equity finds expression," and thus "[w]hen property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." *Simonds v. Simonds*, 380 N.E.2d 189, 193 (N.Y. 1978) (internal quotation marks omitted). The purpose of the constructive trust doctrine "is to prevent unjust enrichment, although unjust enrichment does not necessarily implicate the performance of a wrongful act." *Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 361 (2d Cir. 1999). Such "[u]njust enrichment results when a person retains a benefit which, under the circumstances of the transfer and considering the relationship of the parties, it would be inequitable to retain." *Id.*; *see also Simonds*, 380 N.E.2d at 194 ("What is required, generally, is that a party hold property under such circumstances that in equity and good conscience he ought not to retain it." (internal quotation marks omitted)).

Four factors have been set forth for evaluating whether a constructive trust should be imposed: "(1) a confidential or fiduciary relation, (2) a promise, (3) a transfer in reliance thereon and (4) unjust enrichment." *Sharp*, 351 N.E.2d at 723. These factors, however, are only guidelines, as the "constructive trust doctrine is not rigidly limited." *Simonds*, 380 N.E.2d at 194; *see also Counihan*, 194 F.3d at 362 ("[W]e have observed that, although these factors provide important guideposts, the constructive trust doctrine is equitable in nature and should not be rigidly limited." (alteration and internal quotation marks omitted)). Indeed, the applicability of the constructive trust doctrine "is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them." *Latham v. Father Divine*, 85 N.E.2d 168, 170 (N.Y. 1949).

Accordingly, although none is dispositive on its own, the Court will examine each factor here. Before touching on each factor, however, some framing is necessary. As it is Naushad and

Sabira whom Plaintiffs seek to divest of their property interests, it is the transactions involving those individuals that are at issue here.  Specifically, the Court must examine the circumstances surrounding the transfer from Ahmed and Mustafa to Naushad (and Mr. Hirji) in 1989, and the subsequent transfer from Naushad to himself and Sabira in 2001.  As Defendants correctly point out, whether other titleholders made promises, express or implicit, earlier in the chain of title does not serve to prove that Defendants have been unjustly enriched and should be divested of their property interests.  Thus, in examining the factors for a constructive trust and in balancing the equities, the Court will consider the 1989 transfer and the 2001 transfer.

Turning to the factors, first, there is a confidential or fiduciary relationship.  "Most frequently, it is the existence of a confidential relationship which triggers the equitable considerations leading to the imposition of a constructive trust."  *Sharp*, 351 N.E.2d 721, 723 (N.Y. 1976).  A familial relationship is such a confidential relationship.  *See Reale*, 485 F. Supp. 2d at 253 ("Familial relationships often satisfy th[e] element [of a confidential or fiduciary relationship].");  *Rowe v. Kingston*, 942 N.Y.S.2d 161, 163 (App. Div. 2012) ("As familial relatives, the parties shared a confidential relationship.");  *see also Brand v. Brand*, 811 F.2d 74, 78 (2d Cir. 1987) (noting that the New York Court of Appeals has indicated that a "familial relationship often satisfies [the] first element of constructive trust").  Here, there is a familial relationship among all Parties, and as the record indicates that the relationship was a close one until 2013, (*see* Naushad Tr. 63), the Court concludes that the first factor is satisfied.

The second and third factors, in this case, are closely related.  As Plaintiffs implicitly recognize in their reply papers, (*see* Pls.' Reply 7–12), the operative question is not whether Mr. Hirji intended to convey the Property to Plaintiffs, or whether that was their subjective understanding, *see In re First Cent. Fin. Corp.*, 377 F.3d 209, 216 (2d Cir. 2004) ("New York

law is clear that a constructive trust is an equitable remedy intended to be 'fraud-rectifying'

rather than 'intent-enforcing.'" (quoting *Bankers Sec. Life Ins. Soc'y v. Shakerdge*, 406 N.E.2d

440, 441 (N.Y. 1980)); *Reale*, 485 F. Supp. 2d at 253 ("The record does not contain sufficient

evidence for a reasonable fact-finder to conclude that [the titleholders] *promised* the [plaintiffs']

parents that they would hold the property in trust for the benefit of all [the plaintiffs] after their

parents' deaths.  The only evidence [the] plaintiffs have offered of the existence of a promise is

the plaintiffs' *own* self-serving statements to that effect."); *In re Lefton*, 553 N.Y.S.2d 783, 784

(App. Div. 1990) (holding that even accepting that the claimant's "father promised to convey the

house to him, his father's interest in that house was that of tenant by the entirety," and that

because upon the father's death, the conservatee "owned the house," there was no constructive

trust where "[n]othing in the record show[ed] that the conservatee made any promises regarding

the [claimant's] rights over the subject real property").  Accordingly, even where the facts

suggest "a case of unrealized expectations," the Court "may not, without more, fashion a

constructive trust," because although the "[d]ecedent may well have had a moral obligation to

give the property to [the claimant]," "such an obligation is not enough to set a court in motion to

compel the devolution of property in a certain way." *Binenfeld v. Binenfeld*, 537 N.Y.S.2d 41,

42–43 (App. Div. 1989) (internal quotation marks omitted).

That is not to say, however, that Defendants' promise to hold the Property in trust must

have been an express one.  New York courts have long held that "[w]hile a promise is essential

[to the creation of a constructive trust], it need not be expressly made, for active co-operation or

silent acquiescence may have the same effect as an express promise." *Trs. of Amherst Coll. v.*

*Ritch*, 45 N.E. 876, 887 (N.Y. 1897); *see also Johnson v. Lih*, 628 N.Y.S.2d 458, 459 (App. Div.

1995) ("[I]t is important to note that the promise in question need not be express but may be

'implied or inferred from the very transaction itself.'" (quoting *Sharp*, 351 N.E.2d at 723));

*Tordai v. Tordai*, 486 N.Y.S.2d 802, 804 (App. Div. 1985) ("[A] promise can be implied by the

court where property has been transferred in reliance upon a confidential relationship."). Thus,

where, as here, there is a confidential relationship, the Court must examine the circumstances of

the transfer to determine whether there was an implied promise to hold the property in trust. *See*

*Brand*, 811 F.2d at 78 ("Whether a promise can be inferred from circumstances surrounding the

transfer of property is a question of law.").

It is here, however, that Plaintiffs' case falters. There is ample evidence in the record

speaking to Plaintiffs' general understanding that the Property would be kept as a "family

home":

> "Q: Did your father explain why he wanted the house held in your name and
> Mustafa's name? A: Because he said, [i]t's the family house. It's going to stay as
> a family house." (Ahmed Tr. 14);

> "[Mr. Hirji] told me, I am adding my wife then to make sure the property remains
> for the family. And he—as a mother, if there's any problems, she will have a final
> say. That's why her name was added, to make sure it's a family house." (Hussein
> Tr. 27);

> "All I know, that [Mr. Hirji] told me—he advised me that I am buying this—
> purchasing this home for the family. And you are responsible to take care of it."
> (Latifa Tr. 6.)

Mr. Gould testified to a similar understanding. (*See* Gould Tr. 23.) But none of Plaintiffs ever

testified that this understanding was imparted to Naushad or Sabira. In fact, Ahmed testified that

when the Property was transferred to Naushad and Mr. Hirji in 1989, he did so only because Mr.

Hirji "wanted the house back to him," (Ahmed Tr. 22), and added that at that time, there was no

"discussion regarding what would happen to the house when it was sold," (*id.* at 32). Naushad

himself testified that he had no such understanding, and that it was his belief that the Property

was held for the benefit of Mr. Hirji and himself.  (*See* Naushad Tr. 20–21.)  Naushad, in fact, had no contact with Mr. Gould when the Third Deed was executed.  (*See* Gould Tr. 33.)

In *Reale v. Reale*, a case markedly similar to this one, siblings of two titleholders sought a determination that certain real estate was held in constructive trust pursuant to the wishes of their deceased parents.  485 F. Supp. 2d at 250–51.  The court declined to impose a constructive trust because, among other things, the record was devoid of "any statement from [the titleholders] that they made a promise to their parents that they would hold the property in trust for the rest of the family."  *Id.* at 254.  Pointing to the lack of even an appearance by the titleholders (who were not parties to the case), the court noted that there was no "evidence that [the titleholders] promised the [plaintiffs'] parents, either expressly or through implication, that they would transfer their one-half interests in the property to all ten children equally after the [plaintiffs'] parents' death."  *Id.*

To be sure, there are some factual differences here.  First, in *Reale*, the court noted that the attorney who prepared the legal papers effecting the transfer at issue had "remained silent . . . regarding any information that he may have about the [plaintiffs'] parents' understanding as to the nature and purpose of that transaction," *id.*, whereas here, Mr. Gould has testified that his limited understanding of Mr. Hirji's intent was to establish a "home for his family to live in," (Gould Tr. 10).  Second, the court in *Reale* noted also that there was "no evidence that it was the [plaintiffs'] parents' intent to share their estate equally among all ten children."  485 F. Supp. 2d at 254.  Here, however, there are at least some specific statements offered by Plaintiffs indicating Mr. Hirji's intent to establish a "family home."  But the Court is not persuaded that these differences are material enough to warrant a different outcome.  The question on these Motions is whether Ahmed and Mustafa transferred their interest in the Property to Naushad and Mr. Hirji

in reliance on an express or implied promise from Naushad that the Property would be held in trust for the benefit of Plaintiffs.  There is no evidence that Ahmed and Mustafa conditioned their transfer on such a promise, that Naushad understood that his acceptance of the Property was conditioned on such a promise, or that anyone other than Plaintiffs (and, possibly, Mr. Hirji) held such a view of the Property.

Moreover, Defendants are correct that broad, indefinite statements, such as the understanding here that Property would be a "family home" are too vague to form a constructive trust.  *See Bankers Sec. Life Ins. Soc'y*, 406 N.E.2d at 441 (holding that statements by the titleholder that he would "do the right thing" and "take care of" the decedent's wife and child, "though perhaps evidencing some moral obligation, [could not] be taken to mean that [the titleholder] was bound to fulfill the expressed intention" (internal quotation marks omitted)); *see also Bice v. Robb*, No. 07-CV-2214, 2012 WL 762168, at *7 (S.D.N.Y. Mar. 9, 2012) ("[The titleholder's] asserted promise to 'take care of family' falls miles short of a request to distribute evenly the sale proceeds from the [transaction at issue] to [the] [p]laintiffs."), *aff'd*, 511 F. App'x 108 (2d Cir. 2013); *M v. F*, 910 N.Y.S.2d 406, 2010 WL 1379034, at *3 (Sup. Ct. 2010) (holding that the titleholder's statements that he would "take care of" the claimant and "be there for her," and that "what's mine is yours, what's yours is mine," were "insufficient to fulfill the promissory requirement for a constructive trust" (internal quotation marks omitted)).  The Court is not persuaded that Mr. Hirji's or Plaintiffs' belief that the Property was meant to be a "family home" leads to the conclusion that there was an implied promise, on anyone's behalf, to pass title to the home to the Hirji siblings upon the death of Mr. Hirji.  Although constructive trust is an equitable doctrine not bound by the more rigid rules governing breach of contract or promissory estoppel claims, it would be decidedly inequitable to enforce such an ambiguous promise against

Naushad, who, on the facts available, had no understanding or knowledge of the promise, and to do so in a way that may very well have never been contemplated until Plaintiffs received the Notice of Termination in 2014.

Nor does it aid Plaintiffs that Hussein testified that Mr. Hirji told him he did not want the house to be sold.  (*See* Hussein Tr. 37–38.)  This representation, even if it could be said to have effect on Naushad's and Sabira's rights, does not suggest that Mr. Hirji understood Naushad to be holding the Property in a constructive trust, or that he intended the Property to devolve to his children when he passed away.

There is no evidence of a promise to hold the Property in constructive trust for the benefit of Plaintiffs or a transfer in reliance on such a promise.  Plaintiffs' summary of the argument, somewhat ironically, puts it most aptly: "Mr. H[i]rji intended the Property to be a family house and did not want it to be sold."  (Pls.' Mem. 20.)  Because constructive trusts, however, are used not to effect the intent of titleholders, but to avoid the inequitable and unjust distribution and use of property, this assertion, even if true, is simply insufficient.

Finally, Plaintiffs have not shown that Defendants would be unjustly enriched by retaining title to the Property.  Plaintiffs point out that Naushad has never paid taxes, has never contributed money on improvements to the Property, and does not have knowledge of the extent of the work performed on the Property.  (*See* Pls.' Mem. 17.)  Plaintiffs argue also that Defendants "have not conducted themselves as the owners of the [P]roperty."  (*Id.* at 20.)  Noticeably absent from Plaintiffs' discussion of unjust enrichment is even a single case supporting their position.  Not surprisingly, the law is, in fact, against Plaintiffs on this point.  There is no requirement that titleholders "conduct[] themselves as the owners of the property" to avoid a constructive trust, and such a criterion would be inconsistent with the maxim that the

purpose of a constructive trust is to afford an equitable remedy "[w]hen property has been *acquired in such circumstances* that the holder of the legal title may not in good conscience retain the beneficial interest." *Simonds*, 380 N.E.2d at 193 (emphasis added) (internal quotation marks omitted). The doctrine thus seeks to redistribute property when it was wrongfully acquired (or held in a manner inconsistent with the terms of the acquisition), but not merely when an occupant holds him or herself out as the owner of the property and the titleholder makes no objection to that representation. Plaintiffs' arguments are more suited to a claim for adverse possession, (*see, e.g.*, Am. Compl. ¶ 36), but as Plaintiffs' claim for adverse possession has already been dismissed, (*see* Op. & Order 17–19), they cannot now bootstrap those same principles onto their claim for a constructive trust. As numerous courts have recognized, improvements to a property allegedly held in a constructive trust are frequently undertaken merely for the benefit of the claimants, and do not serve as evidence of unjust enrichment. *See Henning v. Henning*, 962 N.Y.S.2d 189, 192–93 (App. Div. 2013) ("[M]ost of the improvements undertaken by the [claimant] were principally made for the benefit of her, her husband, and their children. Moreover, even accepting that the property was improved, the [claimant] failed to demonstrate that such improvements unjustly enriched the defendants, given that the [titleholders] did not seek, and did not receive, any payments from the [claimant] for her use and possession of the property for nearly 25 years."); *Lefton*, 553 N.Y.S.2d at 784–85 ("[The claimant's] expenditures to improve and maintain the subject premises may be satisfactorily explained by his desire to improve the surroundings in which he and his family lived."). The question, in any event, is not whether Defendants have been unjustly enriched by the improvements—Plaintiffs may very well have a claim for unjust enrichment for the cost of those improvements—but rather whether Defendants would be unjustly enriched by being allowed to

retain title to the Property.  It would be a perverse application of justice, in the Court's view, if Plaintiffs were permitted to obtain title to the Property via a constructive trust by simply investing time and resources into the Property, apparently without the knowledge of Naushad, and without otherwise showing that Naushad made a promise, express or implied, to hold the Property in trust for the benefit of Plaintiffs and their siblings.

Plaintiffs' Motion for Summary Judgment is therefore denied, and Defendants' Motion is granted.

### 5.  Remaining Claims

There still remain two unadjudicated counterclaims raised by Defendants.  (*See* Answer & Counterclaims ¶¶ 16–19 (Dkt. No. 13).)  In their Notice of Motion, Defendants indicate they seek "severance of Defendants' counterclaims."  (Dkt. No. 75.)  The Court is at a loss as to what Defendants are requesting.  There are no other claims remaining in the case, so it is unclear from what other claims the counterclaims would be severed.  Moreover, Defendants already hold title to the Property, and this Order dismisses Plaintiffs' claim to the Property.  It is therefore unclear what relief Defendants could possibly be seeking from the Court.  If their complaint is that Plaintiffs continue to occupy the Property, they are free to commence an eviction proceeding.

Defendants must therefore inform the Court via letter, within five days of the date of this Opinion & Order, what action they request from the Court with respect to the two counterclaims.

### III.  Conclusion

The painful circumstances of this litigation are not lost on the Court.  One need only look at the names of the cases cited herein—*Brand v. Brand*, *Simonds v. Simonds*, *Reale v. Reale*, etc.—to appreciate the soberingly divisive power of these types of disputes, and the Court is under no illusion that its decision will do anything to ease the intrafamilial strains that color this

controversy. But the Court is an arbiter of law and equity, not of family harmony and courtesy, and although law and equity share a common goal of justice, one cannot be used so radically so as to subsume the other. A constructive trust, though equitable in nature, is not an invitation for a court to impose its own sense of social or familial responsibility upon the Parties; Defendants "may well have had a moral obligation to give the property to [Plaintiffs,] but such an obligation is not enough to set a court in motion to compel the devolution of property in a certain way." *Binenfeld*, 537 N.Y.S.2d at 42–43 (internal quotation marks omitted). Because law and equity compel a result in favor of Defendants, the Court must rule accordingly.

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is denied and Defendants' Motion for Summary Judgment is granted. Defendants shall submit a letter within five days of the date of this Opinion & Order informing the Court of how they wish to proceed with the remaining counterclaims.

The Clerk of Court is respectfully requested to terminate the pending Motions. (Dkt. Nos. 64, 75.)

SO ORDERED.

DATED: March 28, 2017
       White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

33